AO 106 (Rev. 04/010) Application for Search Warrant    AUTHORIZED AND APPROVED/DATE:  D.H. Dilbeck 7/10/2024

# UNITED STATES DISTRICT COURT
### for the

_____WESTERN_____ DISTRICT OF_____OKLAHOMA_____

| | |
|---|---|
| In the Matter of the Search of ) <br> *(Briefly describe the property to be search* ) <br> *Or identify the person by name and address)* ) <br> STORAGE 'R' US PREMISE ) <br> FORMERLY RENTED BY AKHILESH ) <br> LALA AND/OR MEMORIES THROUGH ) <br> MONUMENTS, LLC ) | Case No: M-24- 562-SM |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

See Attachment A

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Code Section*                                 *Offense Description*
18 U.S.C. § 1343                               Wire Fraud

The application is based on these facts:

See attached Affidavit of Special Agent Albert Taylor Hayes, FBI, which is incorporated by reference herein.

- ☒ Continued on the attached sheet(s).
- ☐ Delayed notice of [No. of Days] days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

*Applicant's signature*

Albert Taylor Hayes
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: _____ July 16, 2024 _____                 _____
                                                                                    *Judge's signature*

City and State:   Oklahoma City, Oklahoma           SUZANNE MITCHELL, U.S. Magistrate Judge
                                                                          *Printed name and title*

2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF STORAGE 'R' US PREMISES FORMERLY RENTED BY AKHILESH LALA AND/OR MEMORIES THROUGH MONUMENTS LLC | Case No. __M-24-562-SM__<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Albert Taylor Hayes, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for an office space formerly rented by AKHILESH LALA ("Lala") and/or his business, MEMORIES THROUGH MONUMENTS LLC ("Memories Through Monuments"). Lala rented the office space, which is located at Storage 'R' US, 3411A S I-35 Service Road, Moore, Oklahoma 73160 (the "SUBJECT LOCATION"), from July 2020 to June 2024. Lala failed to pay rent beginning in approximately April 2024, and eventually vacated the premises in June. In doing so, Lala abandoned and left behind various items of property which are still located at Storage 'R' Us. The location to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 3103.

2.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since December 4, 2022. I am currently assigned to the FBI Oklahoma City Field Office financial crime squad, where I am tasked to investigate violations of federal law, including but not limited to wire fraud (18 U.S.C. § 1343).

1

3.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 have been committed by Akhilesh Lala. Lala used a Facebook account to advertise the sale of cemetery plots which neither he nor his fictitious clients had rights to. Upon information and belief, he operated his Facebook account using computer(s). Furthermore, when meeting with prospective customers (i.e. alleged victims), Lala used documents and advertising material which belonged to Memorial Park Funeral Home & Cemetery ("Memorial Park"), to make his business dealings appear legitimate.  There is probable cause to search the SUBJECT LOCATION, more particularly described in **Attachment A**, for evidence of these crimes as described in **Attachment B**.

## PROBABLE CAUSE

5.  SCI Shared Resources LLC ("SCI") is a company which owns funeral homes and cemeteries all over the United States, including in Oklahoma. SCI has several Oklahoma City locations, one of which is Memorial Park Funeral Home & Cemetery ("Memorial Park"), address 13313 N. Kelley Avenue, Oklahoma City. Within the funeral home side of the business, SCI sells merchandise such as monuments and caskets, and provides services such as transport of the deceased. Within the cemetery side of the business, the company sells interment rights, which is the right of an individual to be buried within a particular plot of land. While SCI or its subsidiaries owns the cemetery's underlying real

2

estate, the company sells the right to be buried within that real estate to its customers. Customers do not purchase the real estate outright. When a customer purchases interment rights from the cemetery, the cemetery issues a "certificate of interment" to the customer.

6.  Customers can sell their interment rights to other individuals. A customer who wishes to transfer their rights to another individual fills out a "Quitclaim, Release and Transfer of Interest in Cemetery Interment rights and/or Merchandise," commonly referred to by SCI as a quitclaim deed.

7.  Even though customer-to-customer transfers occur using documents called quitclaim deeds, the burial rights to particular plots are transferred, not ownership of the plots themselves.

8.  Akhilesh Lala is a former sales advisor for SCI. As a sales advisor, Lala's job was to sell interment rights and other funeral-related products and services. Lala was familiar with the cemetery industry, including the inner workings of Memorial Park.

9.  SCI terminated Lala's employment prior to 2019 (approximately) due to alleged questionable dealings with clients. After his employment ended, Lala allegedly began fraudulently selling cemetery plots.

### Lala's Online Advertising & Probable Use of Computer

10. Beginning as early as 2019, Lala began posting advertisements on Facebook for the sale of cemetery plots. In some cases these posts were in Facebook Marketplace, and in other cases they appeared on victims' main pages, as part of their feed. The victims subsequently reached out to Lala, and sales discussions occurred through Facebook Messenger, text message, and/or telephone call.

### Victim #1 aka "R.E."

11. R.E. had a Facebook account in 2019. In 2019, an advertisement purporting to sell cemetery plots appeared as part of R.E.'s Facebook feed. The advertisement had been posted by "Akhi Lala." According to the advertisement, the plots were being offered for well below retail price for "quick sale."

12. R.E. knew Lala from previously working with him. He called Lala, and Lala repeated the representations made in the Facebook advertisement. Lala added that a client of his had inherited the plots and wanted to sell them quickly. R.E. offered to purchase eight (8) plots for five thousand dollars ($5,000.00) total, which Lala accepted. R.E. subsequently paid Lala with a personal check for $5,000.00.

13. Lala instructed R.E. to meet with Memorial Park's office manager, Sylvia Schneider ("Schneider") to complete the necessary paperwork. R.E. met with Schneider within a week. As office manager, one of Schneider's responsibilities was to create the paperwork that reflected transfers of interment rights. She provided paperwork to R.E., who was led to believe the paperwork was legitimate. In reality, Schneider did not have authorization from SCI to create fraudulent paperwork; Lala did not have authority to sell Memorial Park's cemetery plots; and there was no underlying customer who wanted to transfer their interment rights.

### Victim #2 aka "E.B."

14. E.B. had a Facebook account in 2019. In December 2019, E.B. noticed an advertisement for the sale of cemetery plots on Facebook Marketplace. E.B. clicked on the advertisement to determine who posted it. The Facebook profile contained the name "Akhi Lala." E.B. initiated a Facebook Messenger ("Messenger") conversation with Lala.

4

Lala claimed to be selling cemetery plots located at Memorial Park, on behalf of a client who had inherited them. He also claimed that Memorial Park employee Sylvia Schneider would assist E.B. in the transaction. He sent a photograph of a Memorial Park business card with Schneider's contact information to E.B. He also arranged for E.B. to go to Memorial Park and inspect the prospective plots. Lala stated that each plot retailed for one thousand, seven hundred twenty-five dollars ($1,725.00) but that the client wanted a "quick sale," therefore the plots were offered "at least 85-90 percent of retail." This communication occurred on Messenger.

15. E.B. spoke with Schneider as instructed by Lala. After speaking with Schneider, E.B. reached back out to Lala on Messenger. Lala stated he would "flag the spaces" which E.B. was interested in buying and send a photo of them.

16. On or about December 23, 2019, Lala used Messenger to send photos and video of the cemetery plots which E.B. had expressed interest in purchasing. Lala also sent a photograph with two gray headstones, one of which he said would be included in E.B.'s purchase.

17. On or about December 24, 2019, E.B. informed Lala via Messenger that he would purchase cemetery plots from Lala's "clients" for seven thousand dollars ($7,000.00). Lala requested that E.B. issue a personal check to "Affordable Headstones USA." He also asked for personal information from E.B., which he said was for a "new Deed and Quit Claim Form."

18. On or about December 26, 2019, Lala used Messenger to arrange an in-person meeting between himself, E.B., and E.B.'s wife, at the cemetery. At the meeting, E.B. and his wife paid Lala, then met with Schneider separately at the funeral home to finalize the

5

transaction's paperwork. Schneider did not have authorization from SCI to create

fraudulent paperwork; Lala did not have authority to sell Memorial Park's cemetery

plots; and there was no underlying customer who wanted to transfer their interment

rights.

19. During his sales pitches, it was common for Lala to use advertising material bearing the

names Memorial Park and/or Dignity Memorial. These documents included, but were

not limited to, cemetery maps, charts price lists, and cemetery rules and policy,

including, for example, the following map:



**Lala's Occupation of Office Space at Storage 'R' Us**

20. Lala is also the owner and operator of Memories Through Monuments. According to his business card, the company sells a variety of products to adorn and decorate cemetery plots, such as markers, monuments, headstones, plaques, and benches.



21. Between 2020 and 2024, Lala rented an office space at Storage 'R' Us, where he operated Memories Through Monuments.

22. When discussing the sale of cemetery plots with his victims, Lala told them he was selling the plots on behalf of clients, who supposedly owned the plots. During some discussions, Lala added that he operated his own business – Memories Through Monuments – which could provide markers, headstones, and other items to adorn the bare plots. Several victims not only purchased cemetery plots from Lala's "clients," but

7

also ordered products from Lala's company. At least one victim physically visited Lala's office at Storage 'R' Us to deliver payment to Lala.

23. In my training and experience, I know that persons committing fraud at their offices often leave traces and remnants of their criminal activities throughout their offices. These traces will often include, but are not limited to, contracts and/or agreements, hand-written notes, digital search records, digital notes and/or letters, receipts, mail, letters, brochures, etc. Additionally, I know from my training and experience that persons using their computers and other electronic devices to commit fraud crimes at their offices often keep those computers and other electronic devices at their offices.

24. Given the fact that Lala parlayed his fraudulent sale of cemetery plots into business opportunity for his own separate company, and induced at least one victim to visit the Memories Through Monuments office space to deliver payment, there is probable cause to believe that he utilized the Memories Through Monuments office space to perpetrate the offense and that the property Lala abandoned at the office space will include evidence, instrumentalities, and fruits of the crime.

### Computers, Electronic Storage, And Forensic Analysis

25. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT LOCATION, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, a smart phone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26. *Probable cause.* I submit that if a computer or storage medium is found at the SUBJECT

LOCATION, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

9

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    e. Based on actual inspection of other evidence related to this investigation, namely financial records and BuilderTrend files, I am aware that computer equipment was used to generate, store, and print documents used in the scheme to defraud investors. There is reason to believe that there is a computer system currently located on the SUBJECT LOCATION.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT LOCATION because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer

10

file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.

11

Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

12

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

28. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

13

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

14

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

30. Based on the foregoing, there is probable cause to believe Lala's former office space at Storage 'R' Us contains evidence of violations of 18 U.S.C. § 1343 (wire fraud). I therefore respectfully request the Court issue the proposed search warrant for the SUBJECT LOCATION (as set forth in Attachment A), for items described in more particular detail in Attachment B.

31. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

_albert Taylor Hayes_

Albert Taylor Hayes
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on ___July 16___, 2024

_____

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A

## Premises/Property to Be Searched

This warrant applies to the office space formerly rented by Akhilesh Lala at Storage 'R' Us, located at 3411A S I-35 Service Road, Moore, Oklahoma 73160. The office is a freestanding building on the north side of the Storage 'R' Us parking lot.



## ATTACHMENT B

### Particular Things to be Seized

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), namely:

1. Any and all photographs, notes, documents, records, or correspondence pertaining to the violations described in the affidavit, including specifically all documents or records related to the fraudulent sale or attempted sale of cemetery plots or internment rights

2. Any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized, and forensic copies thereof.

   a. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii. passwords, encryption keys, and other access devices that may be necessary to access the device;

      iii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

      iv. records of or information about Internet Protocol addresses used by the device;

      v. records of or information about the device's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

b.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

c.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

3.  Burial-plot markers, headstones, or monument.